**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

Robert Mackey (SBN 125961)
bobmackeyesq@aol.com
**LAW OFFICES OF ROBERT MACKEY**
16320 Murphy Road
Sonora, CA 95370
(412) 370-9110

Melissa R. Emert *(pro hac application forthcoming)*
Gary Graifman *(pro hac application forthcoming)*
**KANTROWITZ, GOLDHAMER, GRAIFMAN, PERLMUTTER & CARBALLO P.C.**
135 Chestnut Ridge Road, Suite 200
Montvale, NJ 07645
Tel: (845) 356-2570
memert@kgglaw.com
ggraifman@kgglaw.com

Matthew Smith *(SBN 309392)*
**MIGLIACCIO & RATHOD LLP**
315 Montgomery Street
Suite 900
San Francisco, CA 94104
Tel: (202) 470-3520
msmith@classlawdc.com

CHRIS FALCO, MARCUS MORGAN, KEE JAKE, HANSEY MOMPOINT, SANDRA BOYD, LASHANNA HAILEY, KITARA KILROY and MANUEL ALBERTO FIGUEROA NAVARRO, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

INTUIT INC. and CREDIT KARMA, LLC.

Defendants.

**Case No.**

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

# CLASS ACTION COMPLAINT

Plaintiffs Chris Falco, Marcus Morgan, Kee Jake, Hansey Mompoint, Sandra Boyd, Lashanna Hailey, Kitara Kilroy and Mauel Alberto Figueroa Navarro, ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendants Intuit Inc. ("Intuit") and Credit Karma, LLC ("Credit Karma") (collectively, "Defendants"). Plaintiffs allege the following upon personal knowledge as to their own acts and experiences, and upon information and belief as to all other matters, including Defendants' policies and practices.

## I. NATURE OF THE ACTION

1. This class action arises from Defendants' failure to maintain reasonable account security and customer protection measures for Credit Karma Money checking ("Spend") and savings ("Save") accounts (collectively, "Credit Karma Money accounts"). Plaintiffs and thousands of other consumers suffered financial losses, unauthorized withdrawals, and account lockouts because Defendants failed to design, implement, and oversee adequate safeguards against fraud and unauthorized access.

2. Credit Karma, a subsidiary of Intuit, offers Credit Karma Money accounts that promise members FDIC-insured deposits, no fees, and secure online access. Plaintiffs and thousands of other consumers nationwide experienced unauthorized withdrawals from their Credit Karma Money accounts, were denied timely access to their funds, or both. Despite receiving prompt notice of these unauthorized transactions, Defendants failed to conduct reasonable investigations and failed to recredit affected accounts as required by the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq., and its implementing regulation, Regulation E, 12 C.F.R. Part 1005.

3. Defendants marketed Credit Karma Money accounts as secure, reliable, and suitable for everyday financial use, representing that they employ robust safeguards to protect user accounts and personal information. In reality, Defendants' systems lacked adequate protections against unauthorized

access and fraud, allowing bad actors to gain access to consumer accounts and initiate unauthorized transfers.

4. Compounding these failures, Defendants implemented account control systems that frequently locked legitimate users out of their own accounts while failing to prevent or stop fraudulent transactions. Consumers were often unable to access their funds for extended periods and were met with ineffective or nonexistent customer support.

5. Contrary to these representations, Defendants' account security systems are defective. Thousands of users have reported fraudulent withdrawals from their Credit Karma Money accounts and extended account lockouts that prevent access to their own funds. These failures reflect systemic negligence: Defendants neither implemented sufficient fraud-prevention mechanisms nor maintained effective customer support channels to respond to victims of unauthorized activity.

6. Defendants' conduct caused Plaintiffs and Class Members to suffer concrete harm, including unauthorized withdrawals, loss of access to their funds, delayed or denied reimbursement, and time spent attempting to resolve fraudulent activity and regain account access.

7. Plaintiffs bring this action to hold Defendants accountable for (a) violating the EFTA and Regulation E by failing to properly investigate and reimburse unauthorized transactions; (b) failing to implement reasonable safeguards to prevent unauthorized account access; and (c) engaging in unfair and deceptive practices in connection with the marketing and operation of Credit Karma Money accounts.

8. Plaintiffs seek damages, restitution, and injunctive relief requiring Defendants to implement lawful and adequate fraud-prevention, investigation, and customer-response systems.

## II. PARTIES

***Defendants Intuit and Credit Karma***

9. Defendant Intuit Inc. is a Delaware corporation with its principal place of business in Mountain View, California. Intuit develops and operates financial software and technology services, including TurboTax, QuickBooks, and Credit Karma. Intuit acquired Credit Karma in December 2020 and, at all relevant times, exercised ownership and control over its operations.

10. Defendant Credit Karma, LLC is a Delaware limited liability company with its principal place of business in Oakland, California. Credit Karma operates a consumer financial platform that offers credit monitoring, personal finance tools, and the Credit Karma Money accounts used by Plaintiffs and the proposed Class.

11. Both Defendants collect, store, and process sensitive PII of Credit Karma Money customers, including government-issued identification, Social Security numbers, and bank account credentials. Defendants are responsible for designing, maintaining, and monitoring the systems and security infrastructure that safeguard this information.

12. On information and belief, Intuit exercises operational control over key aspects of Credit Karma's data handling and product infrastructure, including security policies and privacy compliance frameworks. Intuit maintains unified privacy terms for its subsidiaries and directly benefits from Credit Karma's collection and use of consumer data. Accordingly, both Defendants jointly design, implement, and oversee the deficient security practices at issue in this case.

***Plaintiffs***

13. Plaintiff Chris Falco is a citizen of Florida and resides in Naples, Florida. Plaintiff Chris Falco became a member of Credit Karma after Credit Karma began offering Credit Karma Money accounts in 2020, after which Plaintiff Falco opened a Credit Karma Money account.

14. Plaintiff Marcus Morgan is a citizen of California and resides in Sacramento, California. Plaintiff Morgan became a member of Credit Karma in or around 2017. After Credit Karma began offering Credit Karma Money accounts in 2020, Plaintiff Morgan opened a Credit Karma Money account.

15. Plaintiff Kee Jake is a citizen of Georgia and resides in Columbus, Georgia. Plaintiff Jake became a member of Credit Karma in or around 2024. After Credit Karma began offering Credit Karma Money accounts in 2020, Plaintiff Jake opened a Credit Karma Money account on or about January 2024.

16. Plaintiff Hansy Mompoint is a citizen of New York and resides in Freepoint, New York. Plaintiff Mompoint became a member of Credit Karma in or around 2009. After Credit Karma began offering Credit Karma Money accounts in 2020, Plaintiff Mompoint opened a Credit Karma Money account in 2020.

17. Plaintiff Sandra Boyd is a citizen of California and resides in Los Angeles, California. Plaintiff Boyd became a member of Credit Karma in or around 2019. After Credit Karma began offering Credit Karma Money accounts in 2020, Plaintiff Boyd opened a Credit Karma Money account in April 2021.

18. Plaintiff Lashanna Hailey is a citizen of Texas and resides in Houston, Texas. Plaintiff Hailey became a member of Credit Karma in or around 2013.After Credit Karma began offering Credit Karma Money accounts in 2020, Plaintiff Hailey opened a Credit Karma Money account.

19. Plaintiff Katira Kilroy is a citizen of Rhode Island and resides in Providence, Rhode Island. Plaintiff Kilroy became a member of Credit Karma in or around 2012. After Credit Karma began offering Credit Karma Money accounts in 2020, Plaintiff Kilroy opened a Credit Karma Money account.

20. Plaintiff Manuel Alberto Figueroa Navarro is a citizen of Illinois and resides in Waukegan, Illinois. Plaintiff Navarro became a member of Credit Karma in or around 2019. Plaintiff Navarro opened a Credit Karma Money account in 2021.

## III. JURISDICTION

21. This Court has subject matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the proposed Class includes more than 100 members, at least one Class Member is a citizen of a state different from Defendants, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

22. This Court has personal jurisdiction over Defendants because both are headquartered in California, conduct substantial business in this District, and the conduct giving rise to Plaintiffs' claims was directed from and occurred in substantial part within this District.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here.

## IV. FACTUAL ALLEGATIONS

***Credit Karma Money Accounts and Electronic Fund Transfers***

24. In December 2020, Defendant Intuit Inc. acquired Credit Karma, integrating its operations, data systems, and privacy-compliance functions into Intuit's corporate infrastructure. Credit Karma's privacy and data-handling practices are governed in part by Intuit's company-wide policies and internal risk-management teams.

25. Intuit's published Global Privacy Statement expressly provides that Intuit shares personal information among its affiliated companies, including subsidiaries such as Credit Karma, for business and operational purposes. This includes information regarding consumers' transactions and account activity, which is used to operate, improve, and secure Intuit's products and services.

26. Through this integrated structure, Intuit participates in and benefits from the collection, use, and management of Credit Karma Money customer data and the systems used to authenticate users and process transactions. Intuit therefore shares responsibility for the design, implementation, and oversight of the account security and fraud-prevention systems at issue.

27. Founded in 2007, Credit Karma operates as a consumer financial technology platform that provides credit monitoring, personal finance tools, and, through its Credit Karma Money program, online checking and savings accounts branded as “Spend” and “Save.” In partnership with MVB Bank, Inc., a member of the FDIC, Credit Karma offers these accounts to consumers nationwide, marketing them as fee-free, convenient, and secure. Credit Karma began offering its banking services in October 2020.

28. To open and use a Credit Karma Money account, consumers must provide sensitive personal and financial information, including their name, date of birth, Social Security number, contact information, and linked external bank accounts. Defendants use this information to authenticate users, control account access, and facilitate electronic fund transfers.

29. In the course of offering Credit Karma Money Spend accounts, Defendants issue debit cards to account holders that are directly linked to and draw funds from the customers’ checking accounts. Use of the debit card accesses the same account funds as would an ATM withdrawal or online transfer. Fraudulent activity occurring through unauthorized use of a Credit Karma-issued debit card, whether involving in-person purchases, ATM withdrawals, or online transactions, constitutes unauthorized access to the underlying Credit Karma Money bank account. Accordingly, the fraudulent debit card transactions reported by Plaintiffs and Class Members reflect unauthorized access and theft from their financial accounts, resulting in the loss of funds, diminished account balances, and the harms

described herein. These transactions constitute "electronic fund transfers" governed by the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq., and Regulation E, 12 C.F.R. Part 1005.

30. Because Defendants control the systems governing authentication, account access, and transaction authorization, they are responsible for preventing unauthorized access to consumer accounts and unauthorized electronic fund transfers.

31. In numerous instances, unauthorized actors were able to access consumer accounts, initiate transactions, and transfer funds without authorization. These unauthorized transactions resulted in the loss of funds, diminished account balances, and the harms described herein. The same systems used to authenticate users and authorize transactions also determine whether consumers can access their own accounts. As alleged herein, Defendants' deficient systems not only failed to prevent unauthorized access, but also improperly restricted legitimate users' access to their own funds.

32. The security and integrity of consumer account data and authentication systems are central to Defendants' operations. Defendants' failure to implement reasonable safeguards for these systems directly enabled unauthorized account access, fraudulent transactions, and loss of access to funds.

***<u>Defendants' Privacy Policies</u>***

33. Plaintiffs and Class Members were required to provide sensitive personal information to Defendants, Credit Karma and its parent company Intuit, with  including but not limited to names, addresses, Social Security numbers, dates of birth, driver's license numbers, and bank account details, for the purpose of opening and using Credit Karma Money Spend and Save accounts.

34. In their privacy and marketing materials, Defendants represented that they implemented robust safeguards to protect user accounts and information from unauthorized access and fraud. For example, Credit Karma's published privacy policy states:

- "Credit Karma goes the extra mile when it comes to the safe-keeping of our members' personal information."
- "We use 128-bit or higher encryption to protect data during transmission and encrypt data at rest."
- "We work with independent third parties who regularly assess our site for vulnerabilities."
- "We alert members as soon as possible if we suspect suspicious activity on your account."[1]

35. Intuit's similarly represents in its Global Privacy Statement that it "uses reasonable physical, technical, and organizational safeguards" to protect personal information.[2]

36. These representations conveyed to reasonable consumers that Defendants maintained secure systems designed to prevent unauthorized access to accounts, detect fraudulent activity, and protect consumers from unauthorized electronic fund transfers.

37. Defendants' representations were material to consumers' decisions to open and use Credit Karma Money accounts and to entrust Defendants with access to their funds and financial information. In reality, Defendants failed to implement and maintain reasonable safeguards to prevent unauthorized access to consumer accounts and unauthorized transactions. Defendants' authentication, monitoring, and fraud-detection systems were inadequate to identify and prevent fraudulent activity.

38. As a result of these failures, unauthorized actors were able to access consumer accounts, initiate transactions, and transfer funds without authorization, while Defendants failed to promptly detect or prevent such activity. Defendants' conduct was inconsistent with their representations and failed to meet reasonable consumer expectations regarding account security and fraud prevention.

---

[1] https://www.creditkarma.com/about/security
[2] https://www.intuit.com/privacy/statement/

39. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members suffered unauthorized transactions, loss of access to funds, and time and expense attempting to resolve fraudulent activity.

***Defendants' Failure to Implement Reasonable Account Security and Fraud Controls***

40. Despite these representations, Defendants failed to implement and maintain reasonable safeguards to protect consumer accounts from unauthorized access and unauthorized electronic fund transfers.

41. Beginning at least as early as 2020, Credit Karma Money users experienced widespread unauthorized access to their accounts, fraudulent withdrawals, and prolonged account lockouts. These incidents were reported consistently across consumer complaints and demonstrate systemic deficiencies in Defendants' account-security and fraud-prevention systems.

42. Defendants' failures were not isolated but reflected structural deficiencies in their authentication procedures, transaction monitoring, and response systems for unauthorized activity. Defendants failed to implement adequate controls to prevent unauthorized access, detect suspicious transactions, and intervene before funds were transferred out of consumer accounts.

43. Defendants also failed to maintain effective processes for responding to reports of unauthorized transactions. Consumers frequently encountered delayed responses, inadequate investigations, and failures to restore access to accounts or recredit funds within required timeframes. These deficiencies demonstrate that Defendants' systems were not reasonably designed to prevent unauthorized access or to comply with the requirements of the Electronic Fund Transfer Act and Regulation E.

44. The widespread and recurring nature of these failures shows that Defendants' representations regarding account security and fraud protection were materially false and misleading when made.

45. As a result of Defendants' deficient systems, unauthorized actors were able to access consumer accounts, initiate electronic fund transfers, and remove funds, while Defendants failed to prevent, detect, or timely remedy such activity.

***<u>Defendants' Awareness of Security Failures and Indifference to Consumer Complaints</u>***

46. Defendants have long been on notice that Credit Karma Money accounts were vulnerable to unauthorized access, fraudulent transactions, and account access failures. Beginning no later than 2020, consumers publicly reported unauthorized transfers, missing funds, and account lockouts across online forums, the Better Business Bureau ("BBB"), and other complaint platforms.

47. These reports were widespread and persistent. Over a period of several years, thousands of consumers submitted complaints describing similar experiences, including unauthorized withdrawals, inability to access funds, and prolonged delays in resolving fraud disputes.

48. Despite this notice, Defendants failed to remedy deficiencies in their authentication systems, transaction monitoring, and fraud-response procedures. Defendants did not implement adequate measures to prevent unauthorized access or to ensure that reported fraud was promptly investigated and resolved.

49. Consumers repeatedly reported that Defendants' customer-support system was inaccessible and ineffective. Victims of unauthorized transactions were often unable to reach live assistance, received delayed or incomplete responses, and were left without access to funds for extended periods.

50. Defendants' practices were inconsistent with their obligations under the Electronic Fund Transfer Act and Regulation E, which require financial institutions to promptly investigate reported unauthorized transactions and recredit consumer accounts where appropriate.

51. Defendants also failed to disclose material facts regarding these known system deficiencies, including the recurring nature of unauthorized account access and the limitations of their fraud-prevention and response systems. Had these facts been disclosed, Plaintiffs and Class Members would not have opened or used Credit Karma Money accounts or would have taken additional steps to protect their funds.

52. The volume and consistency of consumer complaints demonstrate that Defendants were aware of recurring failures in their systems yet failed to take reasonable corrective action. In the past three years, the BBB has investigated approximately 3,198 complaints concerning Credit Karma's financial services, reflecting a surge of consumer frustration with the company's security vulnerabilities.[3]

53. As a result of Defendants' knowing failure to address these issues, unauthorized actors continued to access consumer accounts and initiate fraudulent transactions, while affected consumers were denied timely relief.

***Plaintiffs' Experiences***

***Chris Falco***

54. Plaintiff Falco opened and maintained a Credit Karma Money account and provided personal and financial information to Defendants for purposes of account access and transactions. Plaintiff Falco reasonably believed that Defendants would maintain secure account access, prevent unauthorized transactions, provide reliable account services and comply with applicable consumer-protection laws.

---

[3] *https://www.bbb.org/us/ca/oakland/profile/credit-services/credit-karma-inc-1116-295805 Id.*

55. Plaintiff Falco used his Credit Karma Money accounts, including his “Save” and “Spend” accounts, to manage funds, including deposits. On or about May 1, 2026, Plaintiff Falco had experienced numerous unauthorized activities involving his Credit Karma debit card which included disputes in the following amounts: $400, $500, $600, $700, $800, $900, and $1,000. Plaintiff Falco was about to get these disputes settled with Credit Karma and had those amounts credited back to his Spend account.

56. As a result of these multiple unauthorized activities, Plaintiff Falco attempted to transfer the sum of $17,077 to his Bank of America account in 3 transactions on May 4th and May 5th of 2026. However, all 3 of these transactions were voided by Credit Karma. Plaintiff Falco was informed by Credit Karma Member Support that that the withdrawals that were made from Plaintiff Falco’s Credit Karma Savings account were not directed to the Bank of America bank account that he had linked, but rather 2 other bank accounts that were linked at the time of the transfers, these being "Coastal GreenFi" And "Fifth Third Bank, National Association".

57. Defendant instructed Plaintiff Franco to contact Coastal GreenFi and Fifth Third Bank directly. Plaintiff Franco was told by these banks that they could not provide him with any information because he was not the account holder. Subsequently, Credit Karma froze plaintiff Falco’s spend accounts and he no longer has access to his account.

58. Plaintiff Falco again notified Defendants and sought assistance. Defendants failed to conduct a timely and adequate investigation and failed to reimburse him for approximately $17,077 in unauthorized transactions. Defendants also restricted Plaintiff Falco’s access to his account, preventing him from accessing his funds.

59. As a result of Defendants' failures, Plaintiff Falco suffered financial loss, loss of access to his account, late fees and related financial consequences, and substantial time and effort attempting to resolve the unauthorized activity, including more than 100 hours spent addressing the issue.

***Marcus Morgan***

60. Plaintiff Morgan opened and maintained a Credit Karma account, including a Credit Karma Money account, and provided personal and financial personal and financial information to Defendants for purposes of account access and transactions. Plaintiff Morgan reasonably believed that Defendants would maintain secure account access, prevent unauthorized transactions, provide reliable account services and comply with applicable consumer-protection laws.

61. In or about 2021, Plaintiff Morgan received an alert that a credit card application had been attempted in his name. Around the same time, Plaintiff Morgan was locked out of his Credit Karma account for approximately 48 hours. Plaintiff Morgan also observed unauthorized or unrecognized inquiries on his credit report associated with his Credit Karma account. At that time, Plaintiff Morgan was locked out of his Credit Karma Money account for approximately forty-eight (48) hours before regaining access.

62. In addition, Plaintiff Morgan noticed unrecognized inquiries on his credit report, labeled "Digital Finance." These inquiries caused his credit score to decrease by approximately twelve (12) points. Plaintiff Morgan attempted to contact Defendants to report these issues and seek assistance. Defendants failed to provide meaningful assistance or adequately respond to Plaintiff Morgan's concerns.

63. As a result of the unauthorized activity and Defendants' failure to provide adequate assistance or reimbursement, Plaintiff Morgan experienced harm including time spent addressing the issue, monitoring his financial information, and the impact of unauthorized inquiries on his credit.

***Kee Jake***

64. Plaintiff Jake opened and maintained a Credit Karma account, including a Credit Karma Money account, and provided personal and financial personal and financial information to Defendants for purposes of account access and transactions. Plaintiff Jake reasonably believed that Defendants would maintain secure account access, prevent unauthorized transactions, provide reliable account services and comply with applicable consumer-protection laws.

65. In or about 2023, Plaintiff Jake observed suspicious activity on her account, including a transaction she did not recognize. Plaintiff Jake reported the issue and submitted a dispute regarding the transaction. Although she was later informed that her dispute had been approved, Defendants subsequently closed her account without meaningful explanation.

66. At the time of closure, Plaintiff Jake had approximately $100 in her account but received approximately $65 as a refund. Plaintiff Jake attempted to contact Defendants to obtain clarification regarding the account closure and missing funds. Defendants failed to provide a meaningful explanation or adequate assistance.

67. As a result of the unauthorized activity and Defendants' failures, Plaintiff Jake has suffered damages, including but not limited to lost funds, loss of access to her account and time spent attempting to resolve the issues.

***Hansy Mompoint***

68. Plaintiff Mompoint opened and maintained a Credit Karma account, including a Credit Karma Money account, and provided personal and financial personal and financial information to Defendants for purposes of account access and transactions. Plaintiff Mompoint reasonably believed that Defendants would maintain secure account access, prevent unauthorized transactions, provide reliable account services and comply with applicable consumer-protection laws.

69. In or about early 2024, Plaintiff Mompoint was locked out of his Credit Karma Money account for several days. During this period, Plaintiff Mompoint discovered fraudulent financial

accounts had been opened in his name, resulting in collection efforts for multiple balances of approximately $1,400, $500, $400, and $624. These charges were processed, and Plaintiff Mompoint was never reimbursed.

70. Plaintiff Mompoint notified Defendants and attempted to resolve both the account access issue and the fraudulent activity associated with his financial profile. Although Plaintiff Mompoint was eventually able to regain access to his account, Defendants failed to provide meaningful assistance in addressing the fraudulent accounts or correcting the issues. The fraudulent accounts remained unresolved, and Plaintiff Mompoint continued to experience issues related to those accounts.

71. As a result of the unauthorized activity and Defendants' failures, Plaintiff Mompoint has suffered damages, including but not limited to lost funds, credit related harm and time spent attempting to resolve these issues.

***Sandra Boyd***

72. Plaintiff Boyd opened and maintained a Credit Karma account, including a Credit Karma Money account, and provided personal and financial personal and financial information to Defendants for purposes of account access and transactions. Plaintiff Boyd reasonably believed that Defendants would maintain secure account access, prevent unauthorized transactions, provide reliable account services and comply with applicable consumer-protection laws.

73. Plaintiff Boyd experienced unauthorized activity on her account, including a deposit she did not recognize, followed by unauthorized withdrawals totaling approximately $700–$800. Plaintiff Boyd notified Defendants regarding the unauthorized activity and sought assistance in securing her account and recovering her funds. Defendants failed to provide meaningful assistance or adequately investigate the unauthorized transactions.

74. Shortly thereafter, Plaintiff Boyd's account was locked and subsequently closed without explanation. Defendants informed her they were unable to assist further and returned only the

remaining balance of the account. Defendants failed to reimburse Plaintiff Boyd for the unauthorized withdrawals.

75. As a result of the unauthorized activity and Defendants' failures to provide adequate assistance or reimbursement, Plaintiff Boyd has suffered damages, including but not limited to lost funds, loss of access to her account and, time spent attempting to resolve the issues.

***Lashanna Hailey***

76. Plaintiff Hailey opened and maintained a Credit Karma account, including a Credit Karma Money account, and provided personal and financial personal and financial information to Defendants for purposes of account access and transactions. Plaintiff Hailey reasonably believed that Defendants would maintain secure account access, prevent unauthorized transactions, provide reliable account services and comply with applicable consumer-protection laws.

77. Plaintiff Hailey has been locked out of her Credit Karma Money account for approximately two to three years, with the issue beginning shortly before the lockout became permanent. Despite contacting Credit Karma for assistance, she was given no explanation as to why her account was frozen and remained unable to access it.

78. Plaintiff Hailey has a Credit Karma Money account that she cannot access at all. She deposited approximately ten dollars ($10) into the account but has been unable to use the card or retrieve the funds. To date, she has not received a refund for the money placed on the card.

79. Plaintiff Hailey also reported that in or about 2025, she was notified by T Mobile that her personal information was sold on the dark web.

80. As a result of the unauthorized activity and Defendants' failures to provide adequate assistance or reimbursement, Plaintiff Hailey has suffered damages, including but not limited to lost funds, loss of access to her account and, time spent attempting to resolve the issues.

***Kitara Kilroy***

81. Plaintiff Kilroy opened and maintained a Credit Karma account, including a Credit Karma Money account, and provided personal and financial personal and financial information to Defendants for purposes of account access and transactions. Plaintiff Kilroy reasonably believed that Defendants would maintain secure account access, prevent unauthorized transactions, provide reliable account services and comply with applicable consumer-protection laws.

82. Plaintiff Kilroy was locked out of her Credit Karma Money account for an extended period of time and was unable to access funds held in the account. At the time of the lockout, Plaintiff Kilroy had funds in the account, but she was unable to access or retrieve those funds. Plaintiff Kilroy notified Defendants and sought assistance in regaining access to her account. Defendants failed to restore access, provide a meaningful explanation, or adequately assist Plaintiff Kilroy.

83. During this period, Plaintiff Kilroy also observed inaccuracies on her credit report, including addresses that did not belong to her.

84. As a result of the unauthorized activity and Defendants' failures, Plaintiff Kilroy has suffered damages, including but not limited to lost funds, loss of access to her account, time spent attempting to resolve these issues.

***Manuel Alberto Figueroa Navarro***

85. Plaintiff Navarro opened and maintained a Credit Karma account, including a Credit Karma Money account, and provided personal and financial personal and financial information to Defendants for purposes of account access and transactions. Plaintiff Navarro reasonably believed that Defendants would maintain secure account access, prevent unauthorized transactions, provide reliable account services and comply with applicable consumer-protection laws.

86. In or about 2022, Plaintiff Navarro was locked out of his Credit Karma Money account after attempting to update his phone number associated with the account.

87. Plaintiff Navarro was unable to regain access to his account for an extended period, lasting several months, and continued to experience difficulty updating his account information for nearly two years. In or around 2023, after updating his phone number, Plaintiff Navarro observed that a Chase account appeared within his Credit Karma profile, despite the fact that he has never had a Chase account.

88. Plaintiff Navarro notified Defendants and repeatedly attempted to restore access to his account. Defendants failed to timely restore access or provide meaningful assistance in resolving the issue.

89. When Plaintiff Navarro eventually regained access, he discovered that his account had been closed and contained only a minimal remaining balance.

90. As a result of the unauthorized activity and Defendants' failures, Plaintiff Navarro has suffered damages, including but not limited to lost funds, loss of access to his account and time spent attempting to resolve these issues.

91. The experiences of the named Plaintiffs are not isolated events. Rather, they exemplify a widespread and recurring pattern of fraudulent withdrawals, unauthorized account access, and prolonged lockouts affecting thousands of Credit Karma Money users nationwide.

***<u>The Impact of Defendants' Security Vulnerabilities on Defendants' Users</u>***

92. Plaintiffs' counsel has reviewed numerous public consumer complaints regarding Credit Karma money accounts posted to the Better Business Bureau ("BBB"), Reddit, and other online forums describing consumers' injuries following fraudulent transactions in their Credit Karma Money accounts. These complaints consistently describe similar patterns of misconduct, including unauthorized account access, fraudulent withdrawals, delayed or denied reimbursement, and prolonged account lockouts that prevented customers from accessing their funds.

93. These complaints consistently describe similar patterns of misconduct, including unauthorized account access, fraudulent withdrawals, delayed or denied reimbursement, and prolonged account lockouts that prevented consumers from accessing their funds.

94. Many consumers reported that Defendants failed to promptly investigate reported fraud, failed to recredit stolen funds, or closed accounts after disputes were submitted.

95. Consumers also reported that Defendants' customer-support systems were ineffective, including an inability to reach live representatives and delayed or incomplete responses to urgent fraud-related issues.

96. The complaints further reflect that the affected funds were often critical to consumers' daily lives, including money intended for rent, food, utilities, tax refunds, and other essential expenses.

97. The following are representative examples of consumer complaints publicly available on the BBB website regarding Credit Karma Money accounts:

> Initial Complaint
> 11/16/2024
> My credit karma account was completely hacked, resulting in all of my information changed and nearly $2000 gone. Whomever did it drained my account. ********************* is not acting promptly when this is a major huge ordeal.

> Initial Complaint
> 11/10/2024
> On October 31st, I received an email and then phone call asking if I had changed my password and/or PIN number. I answered both "No". I then checked the app on my phone and saw activity happening on my account in front of my eyes. The suspect transfered money from our savings into our spend account. The suspect got money from an ATM and then also started shopping online. The charges are in **********, *********, and online. I immediately called the bank and asked to have my account frozen. It took the bank a while to do this and the suspect was able to use a virtual card to make further purchases. the total loss was $3208.17. The bank (Credit Karma) started to dispute the case and then reported back to us that there was no error. They are not returning the stolen funds.Credit Karma has a policy limit of 500 dollars a day in transactions. These were multiple transactions for over 500, 600, and 1000 USD within a couple of hours on the same website. (200+ on another transaction. The suspect also took money out of an ATM that is 10 hours away from where we live.We are trying to get the

dispute back open and settled. The moved money from savings account into checking and then spent it all. We desperately need help to get this case resolved.

Initial Complaint
10/29/2024
I use Credit Karma as a financial institution. Credit Karma has stolen money money from my account. And continues to lie about this issue. The proof that it happened, it came from Credit Karma. I have documentation also from **** that validates that they released the money. Credit Karma keeps lying.

Initial Complaint
4/13/2025
I took out a debit card with Credit Karma and when I went to deposit money at a recommended ATM, I couldn't. When I called for help, I couldn't get past the automated system to speak to a live agent. When I did get a live agent, they couldn't understand or speak proper English. When I tried texting customer service through the app chat, they took so long to respond. Overall, I absolutely do not recommend anyone to take out a debit money spend account. The worst customer service hands down.

Initial Complaint
4/13/2025
I made a dispute about fraudulent charges. My dispute was granted. Credit Karma CLOSED my account and said that my money would be transferred to my external account in 7-10 business days. I told them that I was in an emergency situation when this occurred and that I was stranded away from my home and I really needed the funds. My account is still open with my funds.

Initial Complaint
4/6/2025
I had fraudulent charges and Credit Karma has no way to report it due to the stolen money being taken from an ATM. Their system also did not actually lock my digital card and did not properly protect a person from signing in and immediately changing my password, pin and adding the card to an apple wallet. Their system also did not have any way to talk to a real person to help with what their automated system can't.

Initial Complaint
4/5/2025
My account was locked on 4/05/2025 for fraud for whatever reason... they are holding my money & lying saying they can't remove my funds to the external account that is linked to my account! They told me the funds can remain in the account 4 days prior then now they can't and a check hasn't been mailed nor do they have a tracking number they can give me. I need to get my car out of impound immediately and I need my money, it's mine

Initial Complaint
4/4/2025
I was in desperate need of dealing with Credit Karma's spend account. As of February 6, 2022, my account was frozen due to my mother's income taxes being deposited into my account. I provided all the documents requested, and once I did that, they completely disabled and

deactivated my account. I got nowhere with customer service and they don't let you speak to anyone else.

Initial Complaint
4/3/2025
My card was used unauthorized the week of January 20th and for some reason they cancelled the dispute and closed my account after I was promised my refund. Please refund me now, thanks

Initial Complaint
3/29/2025
My card was used unauthorized the week of January 20th and for some reason they cancelled the dispute and closed my account after I was promised my refund. Please refund me now, thanks.

Initial Complaint
03/17/2026
I am filing a complaint against Credit Karma regarding my inability to access my account and funds that were deposited into REMOVEDfederal and state tax refunds were successfully deposited into my Credit Karma account. However, I am currently locked out of my account and unable to access my money. When attempting to verify my identity using my ID, the system repeatedly tells me that something is wrong, without providing any clear explanation or solution.I have been trying to resolve this issue for over a month through Credit Karmas customer support chat. During this time, I have been given no real resolution. I was told multiple times that my case would be escalated to higher-level support, but I have never been contacted by anyone from a higher department, despite requesting it several times.This situation is extremely frustrating and concerning, as I am being denied access to my own funds with no clear path to resolution. This has been going on sense janurary 25th till now march 17th and they still have not gave me a resolution.Desired Resolution:I am requesting immediate assistance in regaining access to my account and full access to my deposited funds. I would also like clear communication from a higher-level representative to resolve this issue promptly.

Initial Complaint
03/16/2026
Someone hacked into my account on March 8, 2026. I called Credit Karma of the suspicious activity. They saw everything I disputed online. Gave me a new virtual card and new bank card on the way. They gave me a new account number. When I looked on the REMOVEDapp I see they suspended the account and my job has all the new account information. They froze my account saying its too risky even when I was given new account numbers. Now my pay check is going to that account and I dont have access to anything. Cant nobody put me on the phone with anyone who put the account on hold. I cant speak to no representative on this and Im trying to have access to my funds.

Initial Complaint
03/09/2026
My account was used on a gambling site that Ive never used before nor uploaded any money. These charges were made without my consent and I filed a dispute as soon as they settled. 34

charges were made to fliff, REMOVEDIve reached out to them as well with no response. Credit Karma has denied my claim Ive submitted a police report, signed affidavit, transactions dispute, work schedule showing I didnt have my phone at the time the charges were made. They are steady sending me to escalation departments and emails every 3 days. Original dispute was filed march REMOVEDbeen appealed twice already. Now my account is suspended and cards cancelled

Initial Complaint
03/08/2026
Credit Karma is NOT a secure place to keep your money or information. Your card will absolutely be hacked, all money drained from your accounts, & there is next to nothing that you can do about it. I lost over $400 & there was no ability to get the proper customer service to file a disput. It was also ridiculously hard to close my accounts, leaving my information out there for the hackers. DO NOT use this site!

Initial Complaint
03/05/2026
I am filing a complaint against Credit Karma due to handling of my account and lack of customer support. I was able to log in to my account until the EXACT day funds became available in my account. Since then, I have been unable to access my account. Now all of a sudden my identity cant be verified yet their 3rd party system tells me otherwise literally REMOVEDtimes since FEB 19! All to activate my debit card. Ive used the chat, Ive called, Ive spoke with supervisors, Ive emailed with multiple case numbers (REMOVED, REMOVED, REMOVED) being expedited with no avail. I just keep getting the same automated email response and their call center reading off of script and then hung up on multiple occasions. REMOVEDhas provided no explanation as to what the actual issue is. My drivers license are valid and correctly corresponds to all info on my account and the liveliness check clearly shows Im alive and breathing. Ive asked for an alternative means to verify being as their current practices arent working only to be be told this is the only way and their is no way around it, but their own website says there is secondary documents that can be used. Ive even had a friend going through the same thing be able to use alternative means while I was with them! Thousands of people have had their taxes deposited into their CK account only to be denied access with them claiming to have "security issues with no resolution. The inability to access my tax refund has caused extreme financial stress and is negatively impacting my ability to fulfill my financial responsibilities and even survive at this point. CK has been toying with peoples livelihood and I demand that this be fixed immediately. I fully expect my account to be cleared by the end of the day. Again, this has been an ongoing issue since FEB 19 and its been a headache ever since. I am requesting assistance from the BBB in obtaining a resolution to this issue so that I can access my money! Thank you.

Initial Complaint
03/03/2026
Federal refund not received. REMOVEDand REMOVEDfully show funds as deposited and settled. Credit Karma has verified all my information is correct but has no trace of my $4,924 federal refund. They have provided no legitimate resolution. My federal refund is missing with no trace. IRS/REMOVEDcan provide no further help. They provided and verified all

information including a ACH Transaction ID to confirm deposit of funds on their end to Credit Karma account. REMOVEDdenying any accountability for funds not being deposited.

Initial Complaint
02/28/2026
I am filing this complaint regarding an extremely serious issue with Credit Karmas banking services.I used Credit Karma and Turbo tax filing to receive my tax refund. A total of $9,484 was deposited into my account on February REMOVED, Almost immediately after the deposit, I experienced fraudulent activity totaling over $3,900. Instead of resolving the fraud promptly, Credit Karma froze my REMOVED of today, my account remains frozen for several days with approximately $3,000 still sitting in the account that I cannot access or move. I have an open dispute for the 3900$! I financial responsibilities, including bills that must be paid. Being locked out of my own funds has caused significant hardship and stress.I trusted Credit Karma with my tax refund and personal financial information. The fact that fraudulent activity occurred right after deposit, followed by my account being frozen without timely resolution, raises serious concerns about their security measures and customer service practices.I am requesting the following:1.Immediate release of the remaining funds in my account.2.Reimbursement of the fraudulent $3,900.3.A clear explanation of how this fraud occurred and why my account has been frozen for an extended period.This experience has been financially and emotionally distressing. I would not recommend Credit Karmas banking services to anyone based on my experience.I am seeking urgent resolution to regain access to my funds and to recover the money lost due to fraud.

98. These complaints are not isolated incidents but reflect a consistent and recurring pattern of failures in Defendants' account security, fraud prevention, investigation procedures, and customer-response systems. The volume, consistency, and duration of these complaints demonstrate that Defendants were on notice of these systemic issues yet failed to implement reasonable corrective measures.

***<u>Defendants Have Failed to Implement Reasonable Security Measures</u>***

99. To open and use Credit Karma Money accounts, consumers were required to provide personal and financial information and entrust Defendants with control over account access, authentication, and transaction processing.

100. By operating Credit Karma Money accounts and controlling the systems used to authenticate users and authorize transactions, Defendants assumed a duty to implement reasonable

safeguards to prevent unauthorized access to consumer accounts and unauthorized electronic fund transfers.

101. Defendants were obligated under federal and state law, common law duties, industry standards, and their own public representations to maintain reasonable administrative, technical, and procedural safeguards to protect consumer accounts and funds.

102. Defendants knew or should have known that online financial accounts are a frequent target of unauthorized access and fraud, and that inadequate authentication, monitoring, and response systems would expose consumers to unauthorized transactions and loss of funds.

103. As financial institutions operating the Credit Karma Money platform, Defendants knew or should have known that their security infrastructure was inadequate to protect customer accounts and that the risk of unauthorized transactions was both foreseeable and substantial. Despite these risks, Defendants failed to employ the safeguards necessary to detect and prevent unauthorized access.

104. Despite these known risks, Defendants failed to implement and maintain reasonable safeguards to prevent unauthorized access to consumer accounts, detect suspicious activity, and intervene before unauthorized transactions were completed.

105. Defendants also failed to maintain adequate systems for responding to reported unauthorized activity, including timely investigation, account protection, and restoration of access to affected consumers.

106. These failures directly enabled unauthorized actors to access consumer accounts, initiate electronic fund transfers, and remove funds without authorization.

107. Plaintiffs and Class Members reasonably expected that Defendants would maintain secure systems capable of protecting their accounts and funds, consistent with Defendants' representations and the standards applicable to financial institutions.

108. Reasonable and widely available safeguards—such as effective authentication controls, transaction monitoring, and timely fraud-response procedures—could and should have prevented or mitigated the unauthorized activity described herein.

109. Defendants' failure to implement these safeguards demonstrates that their systems were not reasonably designed to protect consumer accounts or comply with applicable legal requirements.

***Defendants Are Legally Required to Cover Unauthorized Fraudulent Transactions***

110. The Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693 et seq., and its implementing regulation, Regulation E, 12 C.F.R. Part 1005, govern electronic fund transfers to and from consumers' bank accounts. Under these provisions, financial institutions must protect consumers from unauthorized electronic debits and promptly investigate and remedy disputed transfers.

111. An "electronic fund transfer" ("EFT") includes any transfer of funds initiated through an electronic terminal, telephone, computer, mobile application, or similar device that authorizes a financial institution to debit or credit a consumer's account. 12 C.F.R. § 1005.3(b)(1). Thus, Regulation E therefore applies to online and mobile payment transactions conducted through the Credit Karma Money platform.

112. Regulation E defines a "financial institution" to include not only banks and credit unions but also "any other person that directly or indirectly holds an account belonging to a consumer" or "any other person that issues an access device and agrees with a consumer to provide electronic fund transfer services." 12 C.F.R. § 1005.2(i). Defendants fall within this definition because they issue debit cards, facilitate account access, and provide electronic fund transfer services to consumers.

113. Under the EFTA and Regulation E, when a consumer reports an unauthorized transfer within two business days after learning of the loss or theft of an access device, the consumer's liability is limited to the lesser of $50 or the amount of unauthorized transfers that occurred before notice to the financial institution. 12 C.F.R. § 1005.6(b)(1).

114. Even if notice is delayed beyond two business days, the consumer's liability is still limited to the lesser of $500 or the sum of (a) $50 or the amount of unauthorized transfers occurring within the first two business days, and (b) the amount of unauthorized transfers occurring thereafter that the institution can prove would not have occurred if timely notice had been provided. 12 C.F.R. § 1005.6(b)(2).

115. Regulation E also requires financial institutions to promptly investigate and resolve reported errors, including unauthorized transfers and access issues, within specified timeframes. 12 C.F.R. § 1005.11(a)–(c). The Consumer Financial Protection Bureau interprets these provisions to require institutions to respond promptly to consumer complaints and to restore access to accounts while investigations are pending.

116. Despite these obligations, Defendants routinely fail to comply with Regulation E. Numerous consumer complaints demonstrate that Credit Karma and Intuit have ignored or delayed required investigations, denied reimbursement for clearly unauthorized transactions, and left affected customers locked out of their accounts for weeks or months without recourse.

117. Defendants' repeated disregard of their duties under the EFTA and Regulation E caused Plaintiffs and Class Members to suffer significant financial losses, unauthorized withdrawals, and deprivation of access to their own funds—harms the EFTA was expressly designed to prevent.

***Defendants Failed to Comply with FTC Guidelines***

118. The Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, prohibits "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (FTC") has determined that a company's failure to implement reasonable and appropriate security measures to protect consumer information and accounts constitutes an unfair practice in violation of the FTC Act.[4]

[4] *See*, *e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

119. The FTC has issued guidance to businesses emphasizing that reasonable security practices must be incorporated into all aspects of a company's operations, particularly where companies collect and maintain sensitive personal and financial information and control access to consumer accounts.[5]

120. In its publication, *Protecting Personal Information: A Guide for Business*, the FTC identifies key practices for safeguarding consumer information and preventing unauthorized access, including maintaining reasonable security controls, identifying and addressing system vulnerabilities, and implementing measures to detect and respond to suspicious activity...[6]

121. The FTC has also advised that companies should limit access to sensitive information, implement effective authentication measures, monitor systems for unauthorized activity, and ensure that service providers maintain appropriate safeguards. See *Start with Security*.

122. Through enforcement actions, the FTC has consistently found that a company's failure to implement reasonable safeguards to prevent unauthorized access to consumer accounts and information constitutes an unfair act or practice under Section 5 of the FTC Act.

123. Defendants were aware of these obligations and of the risks associated with unauthorized access to consumer accounts and financial information yet failed to implement and maintain reasonable safeguards consistent with FTC guidance.

124. As alleged herein, Defendants' failure to follow these well-established security practices allowed unauthorized access to consumer accounts, facilitated fraudulent transactions, and resulted in harm to Plaintiffs and Class Members.

---

[5] *Start With Security: A Guide for Business*, Fed. Trade. Comm'n (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf [hereinafter *Start with Security*].

[6] *Protecting Personal Information: A Guide for Business*, Fed. Trade Comm'n (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf.

***Plaintiffs and the Class Suffered Damages***

125. The consequences of Defendants' failure to implement adequate account security and fraud-prevention measures are severe and ongoing. Plaintiffs and Class Members experienced unauthorized transactions, loss of funds, and prolonged loss of access to their Credit Karma Money accounts.

126. In addition, Plaintiffs' and Class Members' personal and financial information was exposed to unauthorized access, increasing the risk of further misuse.

127. Defendants required Plaintiffs and Class Members to provide sensitive personal and financial information as a condition of opening and using Credit Karma Money accounts and to entrust Defendants with control over account access and transactions.

128. Plaintiffs and Class Members did not receive the benefit of their bargain. In exchange for entrusting Defendants with their funds and account access, Plaintiffs reasonably expected secure account systems and protection against unauthorized transactions, which Defendants failed to provide.

129. The unauthorized activity and account access failures were the direct and proximate result of Defendants' failure too:

a. implement reasonable safeguards to prevent unauthorized access to consumer accounts;

b. maintain effective systems to detect and respond to fraudulent transactions; and

c. timely investigate reported unauthorized activity and restore access to consumer accounts.

130. Plaintiffs and Class Members also suffered harm from being unable to access their own funds. Many were locked out of their accounts for extended periods, expenses incurred, missed payments, and were unable to use their money for essential needs.

131. Had Defendants disclosed that Credit Karma Money accounts were vulnerable to unauthorized access and that users could be denied access to their funds, Plaintiffs and Class Members

would not have opened or maintained accounts. Defendants' omission of these material facts was deceptive and caused Plaintiffs' injuries.

132. Defendants possessed the financial and technical resources necessary to prevent these harms but failed to implement reasonable account-security and fraud-prevention measures.

133. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer:

a. Unauthorized withdrawals and loss of funds;

b. Loss of access to their accounts and inability to use their money;

c. Out-of-pocket expenses and financial consequences, including fees and missed payments;

d. Lost time and productivity addressing unauthorized activity and account access issues;

e. Frustration and burden associated with Defendants' ineffective customer-support systems; and

f. Increased risk of further unauthorized activity involving their accounts and information.

134. Plaintiffs and Class Members have spent and will continue to spend significant time and resources addressing these harms, including monitoring their accounts, attempting to recover funds, and restoring access.

135. In addition to monetary damages, Plaintiffs and Class Members have a continuing interest in ensuring that their accounts and information are adequately secured and protected from further unauthorized access.

136. Defendants have failed to take meaningful action to fully remedy these harms or to provide adequate assistance to affected consumers.

## V. CLASS ALLEGATIONS

137. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following proposed classes:

138. **Nationwide Class:** All persons in the United States who experienced unauthorized transactions, unauthorized access, or loss of access to their Credit Karma Money accounts as a result of Defendants' inadequate account security, fraud-prevention systems, or customer-response practices.

139. **California Subclass:** All persons who reside in California who experienced unauthorized transactions, unauthorized access, or loss of access to their Credit Karma Money accounts as a result of Defendants' inadequate account security, fraud-prevention systems, or customer-response practices.

140. **Florida Subclass:** All persons who reside in Florida who experienced unauthorized transactions, unauthorized access, or loss of access to their Credit Karma Money accounts as a result of Defendants' inadequate account security, fraud-prevention systems, or customer-response practices.

141. **Georgia Subclass:** All persons in Georgia who experienced unauthorized transactions, unauthorized access, or loss of access to their Credit Karma Money accounts as a result of Defendants' inadequate account security, fraud-prevention systems, or customer-response practices.

142. **Illinois Subclass:** All persons who reside in Illinois who experienced unauthorized transactions, unauthorized access, or loss of access to their Credit Karma Money

accounts as a result of Defendants' inadequate account security, fraud-prevention systems, or customer-response practices.

143. **<u>New York Subclass:</u>** All persons who reside in New York who experienced unauthorized transactions, unauthorized access, or loss of access to their Credit Karma Money accounts as a result of Defendants' inadequate account security, fraud-prevention systems, or customer-response practices.

144. **<u>Rhode Island Subclass:</u>** All persons who reside in Rhode Island who experienced unauthorized transactions, unauthorized access, or loss of access to their Credit Karma Money accounts as a result of Defendants' inadequate account security, fraud-prevention systems, or customer-response practices.

145. **<u>Texas Subclass:</u>** All persons who reside in Texas who experienced unauthorized transactions, unauthorized access, or loss of access to their Credit Karma Money accounts as a result of Defendants' inadequate account security, fraud-prevention systems, or customer-response practices.

146. The Nationwide Class and all state subclasses are collectively referred to as the "Class," except where it is necessary to distinguish among them.

147. Excluded from the Class are Defendants' officers and directors; officers and directors of any affiliate, parent, or subsidiary of Defendants; employees of counsel in this action; and the presiding judge, the judge's spouse, and members of the judge's staff.

148. **Numerosity**. The Class consists of tens of thousands of individuals across the United States and is therefore so numerous that joinder of all members would be impracticable. Class membership can be readily ascertained from Defendants' own records.

149. **Commonality and Predominance**. Common questions of law and fact exist as to all Class Members and predominate over any  individual questions Common questions include:

a. Whether Defendants maintained adequate account security and fraud-prevention systems;

b. Whether Defendants' systems permitted unauthorized access to consumer accounts;

c. Whether Defendants failed to detect, prevent, or respond to unauthorized transactions and account access issues;

d. Whether Defendants complied with the Electronic Fund Transfer Act ("EFTA") and Regulation E in investigating and resolving unauthorized transactions;

e. Whether Defendants failed to timely restore access to consumer accounts;

f. Whether Defendants' practices were unfair or deceptive under applicable consumer protection laws;

g. Whether Defendants owed and breached duties to implement reasonable account security and fraud controls;

h. Whether Defendants failed to disclose material limitations in their account security and customer-response systems; and

i. Whether Plaintiffs and Class Members are entitled to damages, restitution, or injunctive relief. Defendants engaged in a common course of conduct by implementing uniform account security, authentication, fraud-prevention, and customer-response systems that applied to all Class Members. These uniform practices gave rise to the injuries alleged herein.

150. **Typicality**. Plaintiffs' claims are typical of those of the Class because they arise from the same course of conduct and are based on the same legal theories. Each Plaintiff experienced unauthorized account access, unauthorized transactions, and/or loss of access to their account as a result of Defendants' conduct.

151. **Adequacy**. Plaintiffs will fairly and adequately represent the interests of the Class. Their interests are aligned with those other Class Members, and they have retained counsel experienced in complex consumer protection and financial services class actions. Plaintiffs and their counsel will prosecute this case vigorously on behalf of the Class.

152. **Superiority**. A class action is superior to other available methods for fair and efficient adjudication of this controversy. The damages suffered by individual Class Members is relatively small compared to the burden and expense of individual litigation, making class treatment the most efficient and equitable means of adjudicating the claims. Class treatment also avoids inconsistent judgments and promotes judicial economy by concentrating related claims in a single proceeding.

## VI. CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF THE ELECTRONIC FUND TRANSFERS ACT, 15 U.S.C. § 1693 et seq.
### (On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Subclasses)

153. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

154. The unauthorized and fraudulent transactions described herein constitute "electronic fund transfers" within the meaning of 15 U.S.C. § 1693a(7) and (12).

155. Under the EFTA and its implementing regulation, Regulation E (12 C.F.R. Part 1005), Defendants were required to bear the financial responsibility for unauthorized electronic fund transfers and to limit consumer liability to no more than $50 under 15 U.S.C. § 1693g(a), unless Defendants could establish that Plaintiffs or Class Members unreasonably delayed reporting or authorized the disputed transactions.

156. Plaintiffs and Class Members timely reported the unauthorized transfers to Defendants within two business days after discovery of the fraudulent activity, satisfying the notice requirements

under 15 U.S.C. § 1693g(b) and 12 C.F.R. § 1005.6(b)(1). Despite this, Defendants failed to recredit the affected accounts as required by 15 U.S.C. § 1693f(a).

157. Defendants violated 15 U.S.C. § 1693g(b) by improperly shifting the burden of proof to Plaintiffs and Class Members and by failing to demonstrate that the disputed transactions were authorized.

158. Pursuant to 15 U.S.C. § 1693f(a)–(c), upon receiving notice of unauthorized electronic fund transfers, Defendants were required to promptly:

a. Conduct a reasonable, good faith investigation;
b. Determine whether an error occurred;
c. Report the results of the investigation to Plaintiffs and Class Members; and
d. Recredit the accounts within ten business days if an error was found or if the investigation was not yet complete.

159. Defendants failed to conduct a reasonable or good faith investigation. They disregarded available evidence and failed to review relevant information, including:

a. Customers' historical transaction patterns;
b. Complaints filed with the Federal Trade Commission ("FTC") and Consumer Financial Protection Bureau ("CFPB");
c. Police reports and other documentation submitted by consumers; and
d. The timing, location, and nature of disputed transactions relative to normal account activity.

160. A reasonable investigation would have revealed that:

a. Plaintiffs did not authorize the disputed transactions;
b. Plaintiffs promptly reported the fraudulent activity;
c. Plaintiffs had no prior history of fraud; and
d. The transactions were inconsistent with Plaintiffs' typical usage patterns.

161. Defendants willfully concluded that no error occurred without reasonable basis and failed to timely recredit Plaintiffs' accounts, in violation of 15 U.S.C. § 1693f and 12 C.F.R. § 1005.11.

162. Under 15 U.S.C. § 1693f(e), Plaintiffs and Class Members are entitled to treble damages because Defendants' failure to conduct a good faith investigation was knowing and willful.

163. As a direct and proximate result of Defendants' violations of the EFTA, Plaintiffs and Class Members suffered financial loss, delay in recovery of stolen funds, loss of access to essential monies, emotional distress, and time spent attempting to resolve the disputes.

164. Plaintiffs and Class Members seek actual damages, statutory damages, treble damages under 15 U.S.C. § 1693f(e), reasonable attorney's fees and costs, and all other relief authorized under 15 U.S.C. § 1693m.

165. Plaintiffs further seek injunctive and declaratory relief requiring Defendants to implement and maintain adequate account monitoring, error-resolution procedures, and consumer-notification systems to ensure compliance with the EFTA and Regulation E.

**COUNT TWO**
**NEGLIGENCE**
**(On behalf of Plaintiffs and the Nationwide Class or, alternatively, the Subclasses)**

166. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

167. Defendants owed Plaintiffs and the Class a duty to exercise reasonable care in designing, implementing, maintaining, and monitoring systems used to authenticate account access, prevent unauthorized transactions, and safeguard consumer accounts and funds.

168. Defendants also owed a duty to implement reasonable administrative, technical, and procedural safeguards to protect personal and financial information used to access consumer accounts.

169. This duty arose because Plaintiffs and Class Members were foreseeable victims of inadequate account-security and fraud-prevention systems. Defendants knew or should have known that failure to implement reasonable safeguards would expose consumers to unauthorized access, fraudulent transactions, and loss of access to their funds.

170. Plaintiffs and Class Members entrusted Defendants with control over their accounts, funds, and account-access systems with the reasonable expectation that Defendants would maintain secure systems and protect against unauthorized activity.

171. Defendants breached these duties by failing to implement and maintain reasonable account-security and fraud-prevention measures, including failing to maintain effective authentication procedures, transaction monitoring systems, and customer-response processes.

172. Defendants' misconduct included, among other things, failing to detect and prevent unauthorized access, failing to intervene before unauthorized transactions were completed, and failing to timely respond to and resolve reports of unauthorized activity.

173. Defendants knew or should have known of the risks inherent in operating online financial accounts and the importance of implementing adequate safeguards to prevent unauthorized access and loss of funds.

174. Defendants further breached their duties by failing to provide fair, reasonable, and adequate systems to secure consumer accounts and respond to fraud-related incidents.

175. Defendants' failures were inconsistent with industry standards and applicable guidance, including the requirement to implement reasonable safeguards to protect consumer accounts and prevent unauthorized access.

176. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members suffered financial losses, including unauthorized withdrawals, loss of access to their accounts, and the inability to use their funds.

177. Plaintiffs and Class Members also incurred out-of-pocket expenses, lost time, and other economic damages in attempting to recover funds, restore account access, and address the consequences of Defendants' failures.

178. Defendants had a special relationship with Plaintiffs and Class Members because Defendants controlled access to their financial accounts and funds and required them to provide personal and financial information as a condition of using Credit Karma Money accounts.

179. The harm suffered by Plaintiffs and Class Members was foreseeable. Defendants knew that inadequate account security and fraud-prevention systems would result in unauthorized access, fraudulent transactions, and loss of funds.

Defendants' conduct directly and proximately caused Plaintiffs' and Class Members' injuries, and holding Defendants accountable will promote the implementation of reasonable security practices to protect consumers' financial accounts.

**COUNT THREE**
**VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT – CALIFORNIA (CLRA) CIVIL CODE § 1750 *et seq.***
**(On behalf of Plaintiffs Marcus Morgan and Sandra Boyd and the Nationwide Class or, alternatively, the California Subclass)**

180. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

181. The CLRA protects consumers against unfair and deceptive business practices in transactions intended to result in the sale or provision of goods or services. Defendants provided "services" within the meaning of Cal. Civ. Code § 1761(b), and their acts and omissions fall under the CLRA.

182. Plaintiffs and Class Members are "consumers" within the meaning of Cal. Civ. Code § 1761(d) because they used Defendants' services for personal, family, or household purposes.

183. Defendants engaged in unfair and deceptive acts and practices by misrepresenting and omitting material facts regarding the security of Credit Karma Money accounts, the effectiveness of their fraud-prevention systems, and the reliability of access to consumer funds.

184. Defendants represented that they maintained secure systems designed to protect consumer accounts and prevent unauthorized activity. In reality, Defendants' systems were inadequate to prevent unauthorized access, detect fraudulent transactions, and ensure reliable account access.

185. Defendants also failed to disclose material facts, including that:

186. (a) their account-security and authentication systems were inadequate to prevent unauthorized access;

187. (b) their fraud-detection and response systems were ineffective in identifying and stopping unauthorized transactions;

188. (c) consumers could experience unauthorized transactions and loss of funds; and

189. (d) consumers could be locked out of their accounts and denied access to their funds for extended periods.

190. Defendants had exclusive knowledge of these material facts and actively concealed them from consumers. Defendants were also on notice of these issues through repeated consumer complaints and internal knowledge of system deficiencies.

191. Defendants were obligated to disclose these material facts because they were known only to Defendants, were not reasonably discoverable by consumers, and directly affected the central functionality of the services provided.

192. Defendants' acts, omissions, misrepresentations, and practices originated, at least in substantial part, from California, including decisions regarding account security, fraud-prevention systems, customer communications, and the concealment of material facts.

193. Defendants' conduct violated Cal. Civ. Code § 1770(a), including but not limited to:

(a)(5) representing that services have characteristics, uses, or benefits that they do not have;
(a)(7) representing that services are of a particular standard or quality when they are of another;
(a)(14) representing that a transaction confers rights or remedies that it does not have; and

(a)(16) representing that services were supplied in accordance with prior representations when they were not.

194. Defendants' deceptive practices were material and likely to deceive reasonable consumers. Plaintiffs and Class Members relied on Defendants' representations and omissions in deciding to open and use Credit Karma Money accounts.

195. Had Defendants disclosed the true nature of their account-security and fraud-prevention systems, Plaintiffs and Class Members would not have used Defendants' services or would have taken steps to protect their funds.

196. As a result of Defendants' conduct, Plaintiffs and Class Members suffered injuries, including unauthorized transactions, loss of funds, loss of access to their accounts, and time and expense addressing these issues.

197. Pursuant to Cal. Civ. Code § 1782(a), the California Plaintiffs have provided written notice to Defendants identifying the specific violations of § 1770 and demanding that Defendants correct, repair, replace, or otherwise rectify the unlawful practices described herein.

198. Plaintiffs presently seek injunctive relief under the CLRA. If Defendants fail to provide an appropriate correction within thirty days, Plaintiffs will amend this Complaint to seek damages pursuant to Cal. Civ. Code § 1780, including actual, statutory, and punitive damages, as well as attorneys' fees and costs.

**COUNT FOUR**

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (UCL), Bus. & Prof. Code § 17200 et seq.**

**(On behalf of Plaintiffs Marcus Morgan and Sandra Boyd and the Nationwide Class or, alternatively, the California Subclass)**

199. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

200. Upon information and belief, Defendants Intuit Inc. and Credit Karma, LLC both maintain their principal places of business in California. The acts, omissions, misrepresentations, and

practices giving rise to Plaintiffs' and Class Members' UCL claims, including Defendants' inadequate security, misrepresentations regarding account safety, , and the resulting unauthorized access, fraudulent transactions, and loss of access to funds, originated, at least in substantial part, in California.

201. California's Unfair Competition Law, Business and Professions Code § 17200 et seq., prohibits acts of "unfair competition," including any "unlawful, unfair, or fraudulent business act or practice."

202. Defendants engaged in unlawful, unfair, and fraudulent business practices within the meaning of the UCL.

203. Defendants' conduct is "unlawful" because it violates, among other laws, the CLRA, the California Customer Records Act (Cal. Civ. Code § 1798.80 et seq.), the Electronic Fund Transfer Act, and common-law duties.

204. Defendants' conduct is unfair because it offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Defendants failed to maintain reasonable account-security and fraud-prevention systems, exposing consumers to unauthorized access, loss of funds, and prolonged loss of access to their accounts.

205. Defendants' conduct is "fraudulent" because their representations and omissions regarding the security and reliability of Credit Karma Money accounts were likely to deceive a reasonable consumer. Defendants represented that they maintained secure systems and would protect user accounts, while failing to disclose known deficiencies in their systems that permitted unauthorized transactions and account access failures.

206. As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent practices, Plaintiffs and Class Members have suffered and will continue to suffer actual economic

injury, including, but not limited to unauthorized withdrawals, loss of funds, loss of access to their accounts, and time and expense addressing these issues.

207. Defendants have been unjustly enriched as a result of their conduct by retaining the benefits of consumers' use of their services while failing to provide the secure and reliable account systems promised.

208. Plaintiffs and Class Members seek restitution of all monies wrongfully obtained by Defendants and injunctive relief requiring Defendants to implement reasonable account-security, fraud-prevention, and customer-response measures to protect consumers from further harm.

## COUNT FIVE

**VIOLATION OF THE CALIFORNIA CUSTOMER RECORDS ACT ("CCRA"), Cal. Bus. Prof. Code § 1798.80, *et seq.*, (On Behalf of Plaintiffs Marcus Morgan and Sandra Boyd and the Nationwide Class or, alternatively, the California Subclass)**

209. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

210. Upon information and belief, Defendants Intuit Inc. and Credit Karma, LLC both maintain their principal places of business in California. The acts, omissions, and practices giving rise to Plaintiffs' and Class Members' CCRA claims, including the maintenance and safeguarding of personal information, failure to implement adequate security measures, and failure to timely disclose unauthorized access—occurred, at least in substantial part, in California.

211. At all relevant times, Defendants were "businesses" within the meaning of the California Customer Records Act ("CCRA"), Cal. Civ. Code § 1798.80 et seq., which owned or licensed computerized data including Plaintiffs' and Class Members' personal information.

212. Plaintiffs and Class Members are "customers" under the CCRA, as natural persons who provided personal and financial information to Defendants for the purpose of obtaining financial and related services.

213. Defendants had a duty under Cal. Civ. Code § 1798.81.5 to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect it from unauthorized access, use, , or disclosure.

214. Defendants violated the CCRA by failing to implement and maintain reasonable security measures. As alleged herein, Defendants' inadequate authentication, monitoring, and fraud-prevention systems permitted unauthorized access to consumer accounts and the misuse of personal and financial information.

215. These failures resulted in unauthorized transactions, loss of funds, and loss of access to accounts experienced by Plaintiffs and Class Members.

216. To the extent Defendants' systems were subject to unauthorized access or compromise, Defendants further failed to provide timely and adequate notice to affected consumers as required by Cal. Civ. Code § 1798.82.

217. As a direct and proximate result of Defendants' violations of the CCRA, Plaintiffs and Class Members suffered damages, including economic loss, unauthorized transactions, loss of access to their accounts, and time and expense addressing these issues.

218. Plaintiffs, through counsel, have provided or will provide Defendants with written notice of these violations pursuant to Cal. Civ. Code § 1798.84(b) and will amend this Complaint to seek statutory damages if Defendants fail to cure within the time prescribed by law.

219. Plaintiffs and Class Members seek actual damages, statutory damages as permitted, and injunctive and declaratory relief requiring Defendants to implement reasonable security measures consistent with the CCRA, along with all other relief available under applicable law.

**COUNT SIX**
**FRAUD BY OMISSION/FRAUDULENT CONCEALMENT**
**(On behalf of Plaintiffs and the Nationwide Class or, alternatively, the Subclasses)**

220. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

221. Defendants had a duty to disclose material facts to Plaintiffs and Class Members because:

(a) Defendants had exclusive knowledge of material facts not known to Plaintiffs and Class Members;

(b) Defendants actively concealed material facts; and

(c) Defendants made partial representations that were misleading in the absence of complete disclosure.

222. Defendants knew, or were reckless in not knowing, that their account-security, authentication, and fraud-prevention systems were inadequate to prevent unauthorized access to consumer accounts and unauthorized transactions.

223. Defendants also knew that consumers could experience unauthorized transactions, loss of funds, and prolonged loss of access to their accounts due to these deficiencies.

224. Despite this knowledge, Defendants failed to disclose these material facts to Plaintiffs and Class Members.

225. Defendants instead represented that they maintained secure systems and would protect consumer accounts, while omitting the material facts necessary to make those representations not misleading.

226. The omitted facts were material because a reasonable consumer would have considered them important in deciding whether to open or continue using a Credit Karma Money account.

227. Plaintiffs and Class Members did not know, and could not reasonably have discovered, the omitted facts prior to using Defendants' services.

228. Had Defendants disclosed the true nature of their account-security and fraud-prevention systems, Plaintiffs and Class Members would not have used Defendants' services or would have taken steps to protect their funds.

229. Defendants' concealment of these material facts was intentional or, at a minimum, carried out with reckless disregard for the truth.

230. As a direct and proximate result of Defendants' fraudulent omissions, Plaintiffs and Class Members suffered damages, including unauthorized transactions, loss of funds, loss of access to their accounts, and time and expense addressing these issues.

231. Defendants' conduct was willful, wanton, and carried out with conscious disregard for the rights of Plaintiffs and Class Members, entitling Plaintiffs to punitive damages to the extent permitted by law.

**COUNT SEVEN**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs and the Nationwide Class or, alternatively, the Subclasses)**

232. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

233. Upon information and belief, Defendants Intuit Inc. and Credit Karma, LLC maintain their principal places of business in California. The acts, omissions, policies, and practices giving rise to Plaintiffs' and Class Members' implied contract claims—including the provision of financial account services, representations regarding account security, and failures to protect consumer accounts and funds—occurred, at least in substantial part, in California.

234. Defendants offered financial and related digital services, including Credit Karma Money accounts, to Plaintiffs and Class Members in exchange for the provision of personal and financial information and the use of Defendants' platform.

235. As a condition of these services, Plaintiffs and Class Members were required to provide personal and financial information and to entrust Defendants with control over account access, authentication, and transactions.

236. Implicit in this exchange was a promise by Defendants to maintain reasonably secure account systems, prevent unauthorized access, and protect consumer funds from unauthorized transactions.

237. These exchanges constituted an implied agreement between the parties: Plaintiffs and Class Members would provide their information and use Defendants' services, and Defendants would implement reasonable security measures to protect account access and funds.

238. Plaintiffs and Class Members performed their obligations under the implied contracts by providing their information and using Defendants' services as intended.

239. Defendants breached the implied contracts by failing to implement and maintain reasonable account-security, authentication, and fraud-prevention measures, thereby allowing unauthorized access to consumer accounts and unauthorized transactions.

240. Defendants further breached the implied contracts by failing to timely investigate reported unauthorized activity and failing to restore access to consumer accounts.

241. Defendants' failures undermined the core purpose of the parties' agreement, namely, to provide secure and reliable financial account services.

242. Defendants were on notice that their systems and security protocols were inadequate yet failed to take reasonable corrective action.

243. As a direct and proximate result of Defendants' breaches, Plaintiffs and Class Members suffered damages, including unauthorized withdrawals, loss of funds, loss of access to their accounts, and time and expense addressing these issues.

244. Defendants also breached a duty of confidence arising from Plaintiffs' and Class Members' disclosure of personal and financial information, which Defendants failed to safeguard against unauthorized access and misuse.

**COUNT EIGHT**
**UNJUST ENRICHMENT/RESTITUTION**
**(On behalf of Plaintiffs and Nationwide Class or, alternatively, the Subclasses)**

245. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

246. Plaintiffs and Class Members conferred substantial benefits upon Defendants by using Credit Karma Money accounts and related services, providing personal and financial information, and entrusting Defendants with control over their accounts and funds.

247. Defendants knowingly accepted and retained these benefits, including revenues derived from consumers' use of their platform and the financial and operational value associated with maintaining customer accounts.

248. In exchange for these benefits, Defendants stated that they would provide secure and reliable account services, including protecting against unauthorized access and unauthorized transactions.

249. Plaintiffs and Class Members relied on these representations in choosing to open and use Credit Karma Money accounts.

250. Defendants failed to provide the promised level of account security and reliability, including failing to prevent unauthorized access, failing to protect consumer funds, and failing to maintain consistent access to accounts.

251. By retaining the benefits of consumers' use of their services while failing to provide secure account systems, Defendants were unjustly enriched at the expense of Plaintiffs and Class Members.

252. It would be inequitable and unjust for Defendants to retain these benefits without providing restitution for the harm caused.

253. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members suffered losses, including unauthorized withdrawals, loss of funds, loss of access to their accounts, and time and expense addressing these issues.

254. Plaintiffs and Class Members seek restitution and disgorgement of all benefits and revenues unjustly retained by Defendants, together with all other relief available in equity.

**COUNT NINE**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(On behalf of Plaintiffs and Nationwide Class or, alternatively, the Subclasses)**

255. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

256. This Count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and applicable state law providing for equitable relief.

257. As alleged herein, Plaintiffs and Class Members entered into an implied agreement with Defendants requiring Defendants to provide reasonably secure and reliable account services, including protecting against unauthorized access, unauthorized transactions, and loss of access to funds.

258. Defendants also owed independent duties of care to Plaintiffs and Class Members to maintain reasonable account-security, authentication, and fraud-prevention systems consistent with applicable law and industry standards.

259. Defendants continue to control Plaintiffs' and Class Members' accounts and associated personal and financial information but have failed to implement adequate safeguards to prevent unauthorized access, detect fraudulent activity, and ensure reliable access to accounts.

260. Plaintiffs and Class Members have already suffered harm, including unauthorized transactions, loss of funds, and prolonged account lockouts, and remain at risk of future harm absent corrective measures.

261. Accordingly, Plaintiffs seek a declaration that Defendants' current account-security, fraud-prevention, and customer-response systems are inadequate and fail to satisfy Defendants' legal and contractual obligations.

262. Plaintiffs further seek injunctive relief, requiring Defendants to implement and maintain reasonable measures to protect consumer accounts, including but not limited to:

a. Implementing effective authentication and account-verification procedures to prevent unauthorized access;

b. Maintaining systems to detect, monitor, and prevent unauthorized transactions in real time;

c. Establishing prompt and effective procedures for investigating reported unauthorized activity and restoring access to affected accounts;

d. Providing timely and meaningful customer support, including access to live representatives for fraud-related issues;

e. Conducting regular testing and audits of account-security and fraud-prevention systems and promptly addressing identified deficiencies;

f. Implementing safeguards to prevent unauthorized changes to account credentials; and

g. Providing clear and timely notice to consumers regarding suspicious activity and account access issues.

263. Without such declaratory and injunctive relief, Plaintiffs and Class Members will continue to face a substantial risk of unauthorized access, loss of funds, and loss of access to their accounts.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of themselves and all others similarly situated, respectfully request the Court enter judgment in their favor and against Defendants, and grant the following relief:

a. Certify the proposed Nationwide Class and Subclasses;

b. Appoint Plaintiffs as Class Representatives and undersigned counsel as Class Counsel;

c. Find that Defendants engaged in the negligent, unlawful, unfair, deceptive, and fraudulent conduct alleged herein;

d. Grant declaratory and injunctive relief necessary to protect Plaintiffs and Class Members, including but not limited to an order:

   i. Prohibiting Defendants from engaging in the wrongful conduct alleged herein;

   ii. Requiring Defendants to implement and maintain reasonable account-security, authentication, and fraud-prevention measures sufficient to prevent unauthorized access and unauthorized transactions;

   iii. Requiring Defendants to implement effective systems to detect, monitor, and prevent unauthorized transactions and suspicious account activity in real time;

   iv. Requiring Defendants to establish prompt and effective procedures for investigating unauthorized activity and restoring access to affected accounts;

   v. Requiring Defendants to implement safeguards to prevent

unauthorized changes to account credentials;

vi. Requiring Defendants to provide timely and meaningful customer support, including access to live representatives for fraud-related issues;

vii. Requiring Defendants to conduct regular testing and audits of account-security and fraud-prevention systems and to remediate identified deficiencies;

viii. Requiring Defendants to provide clear and timely notice to consumers of suspicious activity and account access issues; and

ix. Requiring Defendants to implement training and internal controls sufficient to ensure compliance with applicable consumer-protection laws, including the Electronic Fund Transfer Act;

e. Award Plaintiffs and Class Members actual, compensatory, consequential, and general damages, including for unauthorized transactions, loss of funds, loss of access to accounts, out-of-pocket expenses, and time spent addressing Defendants' conduct;

f. Award statutory damages where authorized, including under the California Consumer Legal Remedies Act (Cal. Civ. Code § 1780), the California Customer Records Act (Cal. Civ. Code § 1798.84(b)), and the Electronic Fund Transfer Act (15 U.S.C. § 1693m), as well as punitive damages as permitted by law;

g. Award restitution and disgorgement of all monies wrongfully obtained by Defendants;

h. Award pre-judgment and post-judgment interest;

i. Award reasonable attorneys' fees, costs, and expenses; and

j. Grant such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiffs, on behalf of themselves and the proposed Class, hereby demands a trial by jury as to all matters so triable.

DATED: June 23, 2026

Respectfully submitted,

*/s/ Robert A Mackey*
Robert Mackey (SBN 125961)
bobmackeyesq@aol.com
**LAW OFFICES OF ROBERT MACKEY**
16320 Murphy Road
Sonora, CA 95370
Tel: (412) 370-9110

Melissa R. Emert (Pro Hac Vice Forthcoming)
Gary Graifman (Pro Hac Vice Forthcoming)
**KANTROWITZ, GOLDHAMER, GRAIFMAN, PERLMUTTER & CARBALLO P.C.**
135 Chestnut Ridge Road, Suite 200
Montvale, NJ 07645
Tel: (845) 356-2570
memert@kgglaw.com
ggraifman@kgglaw.com

Matthew Smith (SBN 309392)
**MIGLIACCIO & RATHOD LLP**
315 Montgomery Street
Suite 900
San Francisco, CA 94104
Tel: (202) 470-3520
msmith@classlawdc.com